## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| DAVID LEE SPIKES | : | No. 08-201-2 |
| | : | |

## MEMORANDUM

PRATTER, J.                                                                OCTOBER _13_, 2020

David Lee Spikes seeks immediate release from incarceration by moving for a reduction

of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Spikes bases his motion both on the

attendant conditions relating to COVID-19 pandemic as they may affect Mr. Spikes, who asserts

he has latent tuberculosis, and the First Step Act of 2018. The Government disputes the merits of

the motion. For the reasons that follow, the Court denies the motion.

### BACKGROUND

### I.      Mr. Spikes's Criminal Conduct

Mr. Spikes orchestrated a series of armed robberies and attempts of the same between

November 2007 and March 2008 while on probation. In the seven robberies and attempts,

Mr. Spikes and his associates held up their victims at gunpoint and often restrained them with duct

tape or flex cuffs. Mr. Spikes and his associates stole thousands of dollars of prescription drugs

and other valuables. By the time he engaged in this robbery spree, Mr. Spikes had already incurred

seven adult convictions for receiving stolen property, possessing a weapon, theft, automobile

burglaries, and hindering a criminal investigation.

In December 2008, Mr. Spikes pled guilty to three counts of aiding and abetting substantive

Hobbs Act robberies, in violation of 18 U.S.C. § 1951(a)(2), and to two counts of aiding and

1

abetting the use or carrying of firearms in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). At the time, the mandatory minimum sentence of incarceration for a second or successive Section 924(c) offense was 25 years, even if all Section 924(c) charges were incurred in the same case. 18 U.S.C. § 924(c)(1) (1988 ed., Supp. III); *Deal v. United States*, 508 U.S. 129 (1993).

In advance of sentencing, the Government filed a departure motion under U.S.S.G. §5K1.1 and 18 U.S.C. § 3553(e), which the Court granted. Mr. Spikes was sentenced to 204 months imprisonment to be followed by five years of supervised release. In consideration of the Government's departure motion, Mr. Spikes was relieved of 22 years of additional, consecutive mandatory imprisonment for his § 924(c) charges.

Mr. Spikes is currently serving his sentence at MDC Brooklyn with an anticipated release date of October 4, 2022. He has served approximately 148 months and has earned nearly 21 months credit for good conduct. Mr. Spikes is thus credited with serving about 169 months of his sentence. In his 12 years in custody, Mr. Spikes has not committed any disciplinary infractions.

## II.     Mr. Spikes's Request for Compassionate Release and Medical Records

Mr. Spikes has satisfied the administrative exhaustion requirement as required under 18 U.S.C. § 3582(c)(1)(A)(i). On August 25, 2020, Mr. Spikes moved for compassionate release based on his diagnosis of latent tuberculosis, a change in sentencing law amending Section 924(c) convictions, and his efforts at rehabilitation while incarcerated.

Mr. Spikes's medical records reveal that, although he experiences pain from a persistent shoulder injury, he has no medical conditions currently requiring treatment and is not prescribed any medication. Latent tuberculosis indicates that a person has been exposed to but has not contracted tuberculosis. While in BOP Custody between June 2012 and March 2013, Mr. Spikes

2

received and completed the prophylactic treatment which substantially reduces the risk that latent tuberculosis will progress.  Mr. Spikes, who is 48 years old, is currently asymptomatic.  He is reportedly fully ambulatory and engages in all normal activities of daily living within the prison.

### III.   BOP's Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority",[1] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012.  BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Oct. 8, 2020).   The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i.  This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.  BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies.  In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions on March 13, 2020.

Presently, BOP operations are governed by Phase Nine of the Action Plan.  Memorandum from the Bureau of Prisons on Coronavirus (COVID-19) Phase Nine Action Plan (Aug. 5, 2020), available at https://cic.dc.gov/release/summary-bop-phase-9-covid-action-plan (last visited Oct. 8, 2020).  The current modified operations plan in this phase requires all inmates in every BOP institution to be secured in their assigned cells or quarters to stop any spread of the disease.  Only limited group gathering is permitted, with attention to social distancing efforts to the extent

---

[1]     BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Oct. 8, 2020).

3

possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been cancelled, as has most staff training. BOP is also endeavoring to regularly issue face masks to all staff and inmates and strongly encourages individuals to wear appropriate face coverings when in public areas if social distancing cannot be achieved.

Phase Nine provides for a gradual resumption of residential programming at a reduced capacity, with social distancing measures, and transfers of inmates between institutions and to and from court. Institutions with active COVID-19 cases may make exceptions to programming requirements for the safety of staff and inmates. Legal visits at MDC Brooklyn recently resumed in late September. MDC Brooklyn continues to suspend all other visits to the facility.

Inmates who travel outside of the institution, such as for court appearances, should be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[2] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General

---

[2]     This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of coronavirus transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

MDC Brooklyn currently houses approximately 1,385 inmates. *See* Federal Bureau of Prisons, MDC Brooklyn, available at https://www.bop.gov/locations/institutions/bro/ (last accessed Oct. 8, 2020). MDC Brooklyn reports no current cases of COVID-19 among inmates, although there were 12 cases among inmates in the last six months. *United States v. Miller*, No. 3:15-CR-00113 (JAM), 2020 WL 5259065, at *3 (D. Conn. Sept. 2, 2020).

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse

5

of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).[3]

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[4] but only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition…that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13. In order to find compelling and extraordinary reasons, the policy statement additionally requires a

---

[3]     Because the Court is satisfied that Mr. Spikes's motion has met the exhaustion requirement and because the Government does not raise an exhaustion argument, the Court need not focus on this requirement.

[4]     Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

court to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at \*2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

Without a doubt, all segments of our society have been experiencing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing",[5] frequent and thorough hand-washing, avoidance of close

---

[5]     Some have understandably suggested that this would be better thought of as "physical distancing", insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. The Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Spikes's motion still calls upon the Court to take into serious consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Spikes argues that he should be immediately released given his fear of contracting COVID with a pre-existing condition, recent sentencing reforms in the First Step Act, and his rehabilitative efforts.

As a threshold matter, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune individual, does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (holding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread"); *see also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

The Government contends that Mr. Spikes's concern that he might contract COVID-19 in a prison environment does not present extraordinary and compelling reasons justifying a reduction in his sentence. The Court must agree.

In further support of compassionate release, Mr. Spikes argues that his latent tuberculosis places him at higher risk of contracting COVID-19. Although Mr. Spikes's medical records indicate that he has latent tuberculosis, the same records reflect that he completed the prophylactic

course of treatment, that his condition is controlled, and that he is currently asymptomatic.[6] COVID-19's comorbidity with latent tuberculosis is far from known. The CDC notes that "TB patients who are at least 65 years old, have respiratory compromise from their TB, or other medical conditions…are at greater risk for sever COVID-19 infection." Centers for Disease Control and Prevention, *Tuberculosis and Public Health Emergencies*, https://www.cdc.gov/tb/education/public-health-emergencies.htm (last accessed October 8, 2020). But the same CDC notice is silent on latent TB's interaction with the virus.

That said, a recent observational study of 36 confirmed COVID-19 patients found that "individuals with latent or active TB [Tuberculosis] may be more susceptible to SARS-CoV-2 infection," and identified "tuberculosis history (both of active TB and latent TB) [as] an important risk factor for SARS-CoV-2 infection." Liu Y, et al., *Active or latent tuberculosis increases susceptibility to COVID-19 and disease severity*, MedRxiv, https://doi.org/10.1101/2020.03.10.20033795 (last accessed Oct. 8, 2020). The study, which has yet to be peer reviewed, noted that its findings are limited because of the small sample size.

Given the lack of definitive epidemiological research and medical consensus on the interplay between latent TB and COVID-19, courts have not uniformly spoken on whether latent tuberculosis justifies early release. When courts have granted early release for inmates with latent tuberculosis, the inmate has presented other risk factors, including being of advanced age, suffering from other pre-existing conditions like hypertension and obesity, was incarcerated in a facility with a higher number of positive cases, or was nearing release. *See, e.g.*, *United States v. Ireland*, No. 17-20203, 2020 WL 4050245, at *6 (E.D. Mich. July 20, 2020) (granting release to

---

[6]     *See* Centers for Disease Control and Prevention, "The Difference Between Latent TB Infection and TB Disease," https://bit.ly/2Vha7EJ, last accessed on Oct. 8, 2020 ("Persons with latent TB infection…are infected with *M. tuberculosis*, but do not have TB disease.").

inmate who already tested positive for COVID-19, had latent tuberculosis, and was obese); *United States v. Johnson*, No. CR H-96-176, 2020 WL 3618682, at \*2 (S.D. Tex. July 2, 2020) (granting release to an inmate in his fifties with history of latent tuberculosis where the facility had reported 580 positive cases and ten deaths); *United States v. Burke*, No. 4:17-CR-3089, 2020 WL 3000330, at \*2 (D. Neb. June 4, 2020) (release warranted where inmate suffered from a seizure disorder associated with a brain injury, hypertension, and latent tuberculosis); *United States v. Atwi*, 455 F. Supp. 3d 426 (E.D. Mich. 2020) (compassionate release warranted for inmate serving four-month sentence).

By contrast, Mr. Spikes is 48 years old with no other pre-existing conditions. He does not submit evidence that he is suffering from any respiratory complications or that his latent tuberculosis is not currently controlled. *See United States v. Rodriguez*, No. CR 17-618, 2020 WL 3447777, at \*4 (E.D. Pa. June 24, 2020) (denying compassionate release where inmate received a full course of treatment for his latent tuberculosis); *United States v. Sattar*, No. 02-CR-395 (JGK), 2020 WL 3264163, at \*3 (S.D.N.Y. June 17, 2020) (denying compassionate release for inmate with latent tuberculosis and high cholesterol); *cf. United States v. Clausen*, No. CR 00-291-2, 2020 WL 4260795, at \*6 (E.D. Pa. July 24, 2020) (denying request based on latent tuberculosis where inmate is in his mid-forties and otherwise healthy but granting compassionate release on other grounds). There are currently no reported positive cases in MDC Brooklyn. And, although Mr. Spikes has served most of his sentence, he still has about two years remaining. *See Clausen*, 2020 WL 4260795, at \*8 (inmate's 213-year sentence due to stacked mandatory-minimum terms constituted compelling reason for sentencing reduction). Accordingly, there is no evidence for the Court to conclude that Mr. Spikes's present condition places him at greater risk of COVID-19.

Second, Mr. Spikes asserts that he demonstrates "extraordinary and compelling circumstances" based on the recent sentencing reforms in the First Step Act. Again, the Court cannot agree.

Among its reforms, the First Step Act amended portions of Section 924(c). Section 403 of the Act removed the mandatory minimum 25-year consecutive term for a successive Section 924(c) charge unless the defendant had a previous, final conviction for a Section 924(c) charge at the time of the offense. Were Mr. Spikes sentenced today, there would be only a consecutive seven-year sentence for each Section 924(c) charge. Congress did not, however, make this change to the mandatory minimum penalties under Section 403 of the Act retroactive. Indeed, Congress was unequivocal in its intent that Section 403's amendments do not apply to defendants who were sentenced prior to the Act's enactment. *See* First Step Act § 403(b) ("This section, and the amendments made by this section, shall apply to any offense that was committed before the date of enactment of this Act, if a sentence for that offense has not been imposed as of such date of enactment.")." Because Mr. Spikes was sentenced on September 3, 2009—more than nine years prior to the enactment of the First Step Act—the Act does not apply here. *United States v. Hodge*, 948 F.3d 160 (3d Cir. 2020); *United States v. Clausen*, No. CR 00-291-2, 2020 WL 4260795, at *2 (E.D. Pa. July 24, 2020).

To the extent courts within this Circuit are divided regarding whether the stacking charge constitutes "extraordinary and compelling" circumstances, the Court does not need to reach the issue here. *Compare United States v. Andrews*, 2020 WL 4812626, at *7 (E.D. Pa. Aug. 19, 2020) ("[T]he length of a lawfully imposed sentence," even if "disproportionate," cannot serve as an extraordinary and compelling reason) *with United States v. Clausen*, No. CR 00-291-2, 2020 WL 4260795, at *7-8 (E.D. Pa. July 24, 2020) (defendant's "off the charts sentence" and rehabilitation

11

justified compassionate release). Mr. Spikes never received one of the 25-year stacked terms. Instead, because Mr. Spikes pled guilty, the Government dismissed the third Section 924(c) charge and moved for Mr. Spikes to receive a sentence below the mandatory minimum. Not only does the First Step Act's sentencing reforms not apply to Mr. Spikes, his resulting sentence of 204 months is well below what he could be eligible for today with the First Step Act in effect. [7] Mr. Spikes thus does not demonstrate "extraordinary and compelling" circumstances to justify relief.

Third, Mr. Spikes bases his motion on his efforts at rehabilitation while incarcerated. Although Congress has never defined "extraordinary and compelling" reasons, it has explicitly stated that "rehabilitation of the defendant alone" is insufficient for compassionate release. 28 U.S.C. § 994(t). In the 12 years Mr. Spikes has been in custody, he has not committed a single disciplinary infraction. Mr. Spikes writes that he has accumulated over 2500 hours in programming and is on track to receive his Associates Degree and Life Coaching Certification. Mr. Spikes has also been an active member of the BOP's Suicide Cadre which helps inmates in distress.

The Court absolutely commends Mr. Spikes's rehabilitative efforts. But, because Mr. Spikes neither presents a medical ailment which would warrant release nor demonstrates an entitlement to a sentencing reduction under the First Step Act, the Court cannot grant relief based on Mr. Spikes's rehabilitation.

---

[7]     Under the then-applicable Sentencing Guidelines, the Court determined the advisory sentencing range was between 210 and 262 months. Factoring in the two Section 924(c) charges, the adjusted guideline range jumped to 594-646 months. As noted above, the Court granted the Government's departure motion under U.S.S.G. §5K1.1 and 18 U.S.C. § 3553(e). Absent any departure motions from the Government, were Mr. Spikes to be sentenced today, he would face a sentencing range between 378 and 430 months.

Because the Court cannot grant the relief Mr. Spikes seeks, the Court declines to consider the 3553(a) factors here.

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Spikes's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i).  An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

13